UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
BINGHAMTON

_____

| | |
|---|---|
| ADAM WEITSMAN, an individual; and UPSTATE SHREDDING, LLC, a New York limited liability company;<br><br>     **Plaintiffs,**<br><br>v.<br><br>ROBERT ARTHUR LEVESQUE, III<br><br>     **Defendant.** | **No.:** 3:17-cv-00727-FJS-DEP<br><br>**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**<br><br>**-AND/OR-**<br><br>**ALTERNATIVE MOTION FOR HEARING ON DEFAULT JUDGMENT** |

Pursuant to Fed. R. Civ. P. 55(b)(2) and L.R. 55.2, Plaintiffs Adam Weitsman ("Weitsman") and Upstate Shredding LLC ("USS") (collectively "Plaintiffs"), by and through their undersigned counsel, respectfully request that the Court enter the proposed Default Judgment and Permanent Injunction, attached to **Exhibit A** hereto, against Defendant Robert Arthur Levesque III ("Defendant"). In the alternative, Plaintiffs respectfully request that the Court set a hearing in the entry of judgment against the Defendant.

This Motion is supported by the following Memorandum of Points and Authorities; the Clerk's Certificate of Entry of Default, attached as **Exhibit B** hereto; the Complaint [Doc. 1], attached as **Exhibit C** hereto; the affidavit of Plaintiffs' counsel, Raees Mohamed, attached as **Exhibit D** hereto; Weitsman's affidavit, attached as **Exhibit E** hereto; and all documents on file with the Court, which are hereby incorporated by reference.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION; RELEVANT FACTS

This is a civil action seeking injunctive relief and damages arising out of Defendant's publication of false and defamatory content on the Internet about Plaintiffs. *See* Exhibit C, ¶ 4,

attached hereto. Defendant is a former employee of USS. *See id*. at ¶ 9. Defendant was employed by USS as a scrap metal inspector at its Owego location from approximately November 2011 until approximately December 2014. *See id*. at ¶ 14. Weitsman owns and operates USS, which is a successful scrap metal and recycling business with 18 locations and approximately 500 employees. *See id*. at ¶¶ 12-13.

In or about March 2014, Defendant began exhibiting bizarre, erratic, and abnormal behavior during the course of his employment. *See id*. at ¶ 15. This behavior included wearing a satanic mask at the office during work hours, and making racially motivated and derogatory remarks to and/or about USS customers. *See id*. As a result of his erratic and bizarre behavior, Defendant was terminated from USS in or about March 2014. *See id*. at ¶ 16. Defendant requested a second chance and to continue working for USS. *See id*. at ¶ 17. As a result, Weitsman offered Defendant a second chance, and continued his employment on or about April 2014. *See id*. Unfortunately, Defendant's behavioral issues at work continued, and fearing repercussions to its business, in or about December 2014, USS terminated Defendant's employment. *See id*. at ¶ 18. Thereafter, Defendant moved to Clayton, North Carolina and began a campaign to damage Plaintiffs' professional reputations. *See id*. at ¶ 19.

For almost two years now, the Defendant has been actively defaming and harassing Plaintiffs. *See id*. at ¶ 21. More specifically, Defendant has published countless false and defamatory statements on the Internet that accuse Weitsman of being a murderer, conspiring with others to commit murder, conspiring to dispose of a missing person (i.e., Michele Harris[1]) at the Upstate Shredding recycling plant, selling drugs, using USS to help Cal Harris get away with

---

[1] Michele Harris disappeared on September 12, 2001, and has never been found. Her husband, Calvin Harris, was tried for her murder four times, and was ultimately acquitted of all charges.

murder, using USS to launder drug money, bribing government officials, and working for Joaquín "El Chapo" Guzmán (a reputed drug lord), among other outlandish accusations (collectively the "False Statements"). *See id.* at ¶¶ 21-22.

The Defendant published the False Statements on YouTube.com, Facebook.com, and Twitter.com. Under the user name "robertlev100", Defendant published no less than four YouTube videos about Plaintiffs, all of which falsely identify the Plaintiffs as being murderers, co-conspirators and accomplices to murder, and otherwise responsible for the disappearance of Michele Harris (collectively the "Videos"):

    a.  On or about October 6, 2016, Defendant published a YouTube video captioned: "What really happened to Michele Harris? The Adam Weitsman Connection", located at the YouTube link: https://www.youtube.com/watch?v=pXRR4wj4HJk.

    b.  On or about November 29, 2016, Defendant published a YouTube video captioned: "What Really Happened to Michele Harris? The Curious Case of Kevin Tubbs", located at the YouTube link: https://www.youtube.com/watch?v=YoPvSqexbrU.

    c.  On or about February 3, 2017, Defendant published a YouTube video captioned: "The perfect place to hide a body: 9/11, conspiracy and Michele Harris", located at the YouTube link: https://www.youtube.com/watch?v=IgTnSZ8kNr4&t=24s.

    d.  On or about November 21, 2016, Defendant published a YouTube video captioned: "What Really Happened to Michele Harris? Fake Twitter Accounts of Cal Harris Exposed!", located at the YouTube link: https://www.youtube.com/watch?v=KB5DYxxCfQk.

    e.  On or about July 18, 2017, Defendant published a YouTube video captioned: "Cal Harris & Adam Weitsman: I've Got The Perfect Place to Hide a Body" https://www.youtube.com/watch?v=fRJ6kJyCTxo

See Exhibit D, ¶ 8, attached hereto.  The Plaintiffs were able to have the Videos removed because they violated YouTube.com's policies.  *Id.*  However, Defendant then re-published one of the videos on July 18, 2017, at the link identified in paragraph "e" above. *Id.* at ¶ 9.

Defendant owns and operates a Twitter account, "Robert Levesque @Sandbarfight," which he used to publish the False Statements. Defendant's use of this Twitter account to defame and harass Plaintiffs spans over six months (between January of 2017 and June of 2017) and includes no less than 60 false and defamatory statements about Plaintiffs (collectively the "First Tweets"). *See* Exhibit C, ¶ 27, attached hereto.  The First Tweets include images of USS, Weitsman and Weitsman's family that were used in conjunction with the highly disturbing False Statements. Defendant "tagged" (i.e., included the usernames of other Twitter users so that the published statement is displayed on the additional named Twitter users) third parties, such as the New State Police, the New York FBI, and WBNG 12 News, among others, in an effort to cause Plaintiffs public ridicule. *Id.* at ¶ 29. The First Tweets falsely accuse Plaintiffs of accepting envelopes full of cash from Calvin Harris in exchange for agreeing to dispose of Michele Harris's body – an outlandish statement solely calculated to cause Plaintiffs substantial harm and public ridicule. *Id.* at ¶ 30. The First Tweets include the following false and defamatory statements about Plaintiffs, which falsely claim that Plaintiffs conspired to murder and/or dispose of Michele Harris:

a. "Pt 4. Intrtng [sic] how MANY people in Owego believe Adam Weitsman & #CalHarris conspired in Michele's disappearance. No mention in media at all."

b. "So @Calroyal151 #calharris there shouldn't be ANYONE else who will claim you delivered envelopes to Adam? @nyspolice @Thomas1774Paine #crime."

c. "So @Calroyal151 #CalHarris #CalHarrisTrial what were in the envelopes you gave to Adam Weitsman of Upstate Shredding? @CrimeWatchDaily."

d. "@CalRoyal151 #calharris How did I know Kristina worked at the Shredder? She stood beside me while we both saw you deliver these envelopes"

e. "Hey @CalRoyal151 #CalHarris Will you ever admit to giving Adam Weitsman envelopes, over the years, after Michele disappeared? #Binghamton"

f. "Any comments on the friendship between @CalRoyal151 #CalHarris & @UpstateShred?  @ISRI @NewYorkFBI @WBNG12News @nyspolice @MetalicoNewYork"

4

g. "Ok @Calroyal151 #calharris Let's hope no one else says they've seen you deliver envelopes to Adam of Shredder! @nyspolice #dateline #crime"

h. "Gon' out West yall. New job. I'll be back later explaining why #CalHarris and Adam Weitsman are responsible for Michele's disappearance."

i. "#Investigate the timelines of #Criminals @CalRoyal151 #CalHarris and Adam Weitsman of @UpstateShred for the #Crimes of #Conspiracy #Murder!"

j. "Jason Lykens SAW the truck that carried Michele's body to the Shredder on 09/12/2001 btwn [sic] 1am and 3 am. #Unsolved #TrueCrime #Crime #CalHarris"

k. "Here is a description of when #CalHarris would drop off cash for Weitsman. Again, they are suing me because I'm telling you the truth."

l. "I gave this statement to @NYSPolice earlier this year! These are not ordinary people, they are connected, well organized, corrupt #CalHarris"

m. "Good thing this is a privately held company and not held under the same standards of public scrutiny as are Corporations. #MoneyLaundering twitter.com/UpstateShred/"

n. "(2/2) These #criminals got away with #Murder #Conspiracy for so long. I'll never stop #Investigating #CalHarris #TeamWeitsman #TrueCrime"

*See* Exhibit C, ¶ 31, and Exhibit A attached thereto.

On or about April 17, 2017, Plaintiffs' counsel demanded that Defendant refrain from defaming Plaintiffs and to remove all of the False Statements he published on the Internet. *See* Exhibit D, ¶ 10, attached hereto. Instead of complying with Plaintiffs' demands, Defendant mocked Plaintiffs' demand on Twitter.com and continued his defamation campaign. *Id.*

In or about June of 2017, Plaintiffs were able to get Defendant's Twitter account closed for violating the Twitter Rules, which prohibits "behavior that crosses the line into abuse, including behavior that harasses [or] intimidates." *Id.* at ¶ 11. However, in or about the end of June of 2017, Defendant created a new Twitter account, "Rob Levesque @VidaliaSBF," solely for the purpose of continuing his harassment and defamation campaign against Plaintiffs. *Id.* at ¶ 12. Notably,

the Defendant used a picture of the deceased victim, Michele Harris, for his profile picture, and **over the last five months, the Defendant has published approximately 594 tweets – approximately <u>537</u> of which repeat the False Statements** and/or were intended to harass and cause Plaintiffs substantial harm and public ridicule (collectively the "Recent Tweets"). *Id.* Defendant has again violated the applicable Twitter Rules that prohibit "[c]reating multiple accounts with overlapping uses or in order to evade the temporary or permanent suspension of a separate account is not allowed." *Id.*

Since July of 2017, Defendant has published approximately 39 false and defamatory posts using his Facebook profile located at https://www.facebook.com/rob.levesque.50 (the "Facebook Posts"). *See id.* at ¶ 13. The Facebook Posts clearly violate Facebook.com's Bullying and Harassment Policy, which prohibits "content that appears to purposefully target private individuals with the intention of degrading or shaming them." *See id.*

Since August of 2017, Defendant has published 8 disparaging posts on Instagram.com using his profile located at https://www.instagram.com/therealroblevesque/ (the "Instagram Posts"), which were also a part of Defendant's campaign to harass and publicly ridicule Plaintiffs. *Id.* at ¶ 14. The Instagram Posts clearly violate Instagram.com's Community Guidelines, which prohibits "content that targets private individuals to degrade or shame them." *See id.* The Facebook Posts and the Instagram Posts repeat the False Statements. *Id.* at ¶ 15. The Videos, the First Tweets, the Recent Tweets, the Facebook Posts, and the Instagram Posts are hereafter referred to collectively as the "Posts."

Defendant Robert Levesque has publicly stated that his intent in publishing the False Statements is to present the False Statements to the media, and to preserve the False Statements so they can be re-published by others ("everything [he] do[es] is to leave a record, please screenshot

everything I post or tweet, in case they are deleted. Review and scrutinize every word I have ever said, my hope IS FOR PEOPLE TO INVESTIGATE IT!" *Id.* at ¶ 16.  Despite being served with the complaint and being provided with an opportunity to appear and defend, on December 3, 2017, Defendant used social media to make a mockery of this case, by posting, "HEY WHAT THE F***???? WHAT THE F****!!!!!!!!!!!! Broome County Courthouse How could Judge Peebles allow these scumbags to pursue a case against ME!!!!!!!!!!!!!"  but without appearing to defend. *Id.* at ¶ 18.  Plaintiffs' counsel requested Defendant to agree to a stipulated injunctive, in order to settle this matter, but he failed to respond. *Id.* at ¶ 19.  Defendant's misconduct in publishing the false and defamatory statements about Plaintiffs is substantially pervasive, and continues on a daily basis. *Id.* at *¶ 20.*

Plaintiffs have: (1) never conspired to commit the murder of Michele Harris or anyone else; (2) did not dispose of Michele's body at USS or otherwise; (3) never accept envelopes of money from Cal Harris for disposing for Michele Harris; (4) never operated a "drug workshop" out of USS or otherwise sold or trafficked any illegal substances from USS or otherwise; (5) never conspired with "El Chapo" or ever communicated with him for any reason; and (6) never been convicted of money laundering. *See* Exhibit E at ¶ 5.

Owego, New York is a very small town of approximately 20,000 people, and Weitsman relies on his professional reputation and on the Internet for continued sales. *Id.* at ¶ 6.

As a result of Defendant's False Statements, (1) Plaintiff USS has spent thousands of dollars on public relations to address and/or resolve the False Statement; (2) Plaintiffs have been contacted by news media asking whether the False Statements are true, drawing unwanted attention to Defendant Levesque's False Statements; (3) Plaintiff Weitsman receives numerous phone calls and texts messages a day from personal friends asking if any of the False Statements

are true, whether he was involved with a murder and/or drugs, and whether he was doing ok; (4) metal and recycling business insiders have come to know of the False Statements and have contacted Plaintiffs to inquire about the False Statements; (5) certain metal and recycling business contacts have refrained from and/or decreased their business with Plaintiffs; (6) Plaintiff Weitsman has become less social, and even deactivated his Facebook account page, which had nearly 100,000 friends/followers; (7) Plaintiff Weitsman's wife has been in distress and fears for her safety; (8) Plaintiff Weitsman has and will continue to suffer public humiliation, extreme emotional distress, anxiety, depression, stomach aches, headaches, muscle pain, lack of sleep, lack of a desire to eat, emotional pain and suffering, anguish, and loss of self-esteem. *Id.* at ¶ 7. Accordingly, USS seeks an award for lost profits in the amount of $200,000.00 (representing the net profits that USS would have received but for the Defendant's defamation), in addition to general damages for loss of reputation.  Additionally, Weitsman seeks an award of $200,000.00 for general damages to loss of reputation and for the emotional harm that he has suffered over the last two years. *Id.* at ¶ 7.

Additionally, there is a substantial risk that unless Defendant's wrongful acts are permanently enjoined, Defendant's conduct, along with the Posts that remain online, will continue to irreparably injure Plaintiffs.  Accordingly, Plaintiffs seek the specific injunctive relief requested herein.

## II.    <u>LEGAL STANDARD</u>

"[A]n order of default, whether 'substantive or not,' carries great significance." *Riggs v. Plaid Pantries, Inc.*, 233 F. Supp. 2d 1260, 1272 (D. Or. 2001).  Once the default order is entered, the defaulted party can no longer contest liability. *Geddes v. United Financial Group,* 559 F.2d 557, 560 (9th Cir.1977) ("upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."); *see also Conetta v. National Hair Care*

*Centers, Inc.,* 236 F.3d 67, 75–76 (1st Cir.2001) (the prevailing view is that an entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability).

When the Court enters a default judgment, it must "accept[ ] as true all of the factual allegations of the complaint," *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir.1981), but "the amount of damages are not deemed true." *Credit Lyonnais Securities (USA) v. Alcantara,* 183 F.3d 151, 152 (2d Cir.1999). The Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Id.* This inquiry "involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence supporting the damages to be determined under this rule." *Id.*

The court has considerable latitude in determining the amount of damages. *Jones v. Winnepesaukee Realty,* 990 F.2d 1, 4 (1st Cir.1993). To fix the amount, the court may conduct a hearing. Fed.R.Civ.P. 55(b)(2). The court is not required to do so, however, "as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.,* 109 F.3d 105, 111 (2d Cir.1997). To award damages, it is not necessary for a court to hold a hearing; instead, a court may rely upon affidavits and documentary evidence. *See Fustok v. ContiCommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir.1989); *Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991) (Rule 55(b)(2) "allows but does not require the district judge to conduct a hearing."); *Twentieth Century Fox Film Corp. v. Streeter*, 438 F. Supp. 2d 1065, 1070-73 (D. Ariz. 2006) (finding that Plaintiff's Application for Default Judgment should be granted and the issuance of a permanent injunction to be appropriate).

Accordingly, because the requested relief is supported by declaration and other documentary evidence, as demonstrated by the attached exhibits, Plaintiffs believe that it is unnecessary for the Court to hold a default hearing.  However, to the extent the Court finds otherwise, Plaintiffs hereby request a hearing.

## III.    ANALYSIS; RELIEF REQUESTED

### A.    General and special damages available in defamation cases

Defamation is the injury to one's reputation, either by written expression (libel) or oral expression (slander). *Morrison v. National Broadcasting Co.,* 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (1967). The elements of libel are: [1] a false and defamatory statement of fact; [2] regarding the plaintiff; [3] which are published to a third party and which [4] result in injury to plaintiff. *Idema v. Wager,* 120 F.Supp.2d 361 (S.D.N.Y.2000); *Ives v. Guilford Mills,* 3 F.Supp.2d 191 (N.D.N.Y.1998). Certain statements are considered libelous *per se.* They are limited to four categories of statements that: [1] charge plaintiff with a serious crime; [2] tend to injure plaintiff in its business, trade or profession; [3] plaintiff has some loathsome disease; or [4] impute unchastity. *Liberman v. Gelstein,* 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992); *Harris v. Hirsh,* 228 A.D.2d 206, 643 N.Y.S.2d 556 (1st dept.1996). Where statements are libelous *per se,* the law presumes that damages will result and they need not be separately proved. *Id.* at 435, 590 N.Y.S.2d 857, 605 N.E.2d 344. The amount of such damages "is peculiarly within the jury's province." *Calhoun v. Cooper,* 206 A.D.2d 497, 497, 614 N.Y.S.2d 762 (1994).

In assessing the amount of damages to award for defamation, a jury is not limited to compensating the plaintiff for "economic" losses, such as demonstrable lost profits. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Rather, a plaintiff may suffer "non-economic" injuries as well. Among these is the loss of reputation, which includes

the loss of professional status and the ability to earn wages, as well as any humiliation or mental suffering caused by the defamation. *See Mattox v. News Syndicate Co.,* 176 F.2d 897, 901–02 (2d Cir.1949) ("[I]t is universally agreed that the damages recoverable in libel are the plaintiff's loss of reputation in the minds of those who know him or know about him, together with this mental suffering as a result of the libel."); *see also Lundell Mfg. Co. v. Am. Broad. Co.,* 98 F.3d 351, 364–65 (8th Cir.1996) (upholding an award of $900,000 for damage to reputation—in addition to a separate award of $158,000 for past and future lost profits—where defendant's act of defamation impaired plaintiff's ability to sell a recycling machine); *Resolution Trust Corp. v. Miramon,* 935 F.Supp. 838, 844 (E.D.La.1996) ("Damages for loss of reputation seek to make one whole for loss of the ability to earn wages, borrow money, and to enjoy life as fully as before the injury."); *Prozeralik v. Capital Cities Commc'ns, Inc.,* 222 A.D.2d 1020, 1021, 635 N.Y.S.2d 913, 914 (4th Dep't 1995) (upholding an award of $6,000,000 for injury to plaintiff's reputation and $3,500,000 for mental suffering—in addition to a separate award of $1,500,000 for direct financial loss—where defendant's act of defamation injured the reputation of prominent local restaurateur), *lv. denied,* 88 N.Y.2d 812, 672 N.E.2d 605, 649 N.Y.S.2d 379 (1996) (Table). "The same rules, of course, apply to a corporation, and where its standing, integrity, or credit are assailed, damages are presumed." *Edwards X-ray Co. v. Ritter Dental Mfg. Co.*, 124 Misc. 898, 899–900, 210 N.Y.S. 299, 301–02 (Sup. Ct. 1925).

Factors appropriately considered by a jury include the seriousness of the criminal conduct alleged (*see Liberman, supra* at 435, 590 N.Y.S.2d 857, 605 N.E.2d 344); the psychological/physical effects to the target from addressing, defending and dealing with these accusations; the size and demographics of the target's community to determine if the stigma would be difficult to evade (*see Rossignol v. Silvernail,* 185 A.D.2d 497, 499–500, 586 N.Y.S.2d 343

(1992), *lv. denied* 80 N.Y.2d 760, 591 N.Y.S.2d 138, 605 N.E.2d 874 (1992)); and the effects that these statements have on a target's reputation and standing in the community, especially where the alleged slander is the sole cause of the target's injuries (*see Frechette v. Special Magazines,* 285 A.D. 174, 178, 136 N.Y.S.2d 448, 453 (App. Div. 1954)).   Furthermore, "[h]istorically, the medium of a defamatory communication has played a significant role in assessing liability" and it follows logically that the medium plays a significant role in assessing damages. *See* Anthony Ciolli, *Chilling Effects: The Communications of Decency Act and the Online Marketplace of Ideas,* 63 U. Miami L. Rev. 137, 141 (2008). "There is no doubt that, in at least some situations, Internet defamation can result in very serious harm." *Id.* at 156. The internet can cause very serious harm because unlike newspaper, radio or television, "the monetary and time costs of publishing online are virtually non-existent" fueling the speed with which information spreads. *Id.* at 145. "Defamation by print implying greater deliberation, a more extensive operation, and a permanent effect, the law will presume damage from less serious matter thus published than when orally uttered." *Hartman v. Morning Journal Ass'n*, 19 N.Y.S. 398, 399–400 (Com. Pl. 1892), *aff'd,* 138 N.Y. 638, 34 N.E. 512 (1893) (citation omitted). "The greater the circulation of the paper, the greater the probable injury." *Id.*

**B.** **General damages sought by Weitsman**

Weitsman seeks general/presumed damages in an amount of not less than $200,000. When considering the applicable factors discussed above, as well as the medium of publication and the number of Posts, $200,000 is an extremely conservative amount to compensate Weitsman for his loss of reputation and the humiliation and mental suffering caused by the defamation and harassment over a period of almost two years. Unfortunately, Weitsman is incapable proving special/actual damages with reasonable certainty.

After receiving a cease and desist letter from counsel in mid-April of 2017 that specifically explained to the Defendant why the publications were false, defamatory and highly damaging to the Plaintiffs, the Defendant's defamation and harassment of the Plaintiffs significantly increased. Notably, since mid-April of 2017, the Defendant has published – on the World Wide Web -- approximately **595**[2] Posts about Weitsman and/or his company, all of which expressly or impliedly accuse Weitsman of being a murderer, conspiring with others to commit murder, conspiring to dispose of a missing person at USS's plant in New York and using USS to help Cal Harris get away with murder, selling drugs, using USS to launder drug money, bribing government officials, and/or working for Joaquín "El Chapo" Guzmán (a reputed drug lord). Accordingly, the factor pertaining to the extent of circulation favors a substantial award.  Everyday -- the Defendant continues to maliciously post false and defamatory content about Plaintiffs.

Similarly, because murder is one of the most serious crimes, the False Statements are clearly libelous *per se*, and the factor pertaining to the seriousness of the criminal conduct favors a substantial award. The same is true for the factor pertaining to the psychological/physical effects to the target from addressing, defending and dealing with these accusations.  Weitsman and his family have had to defend against these allegations for almost two years.  *See* Exhibit E at ¶ 7.  It has caused him and his family pure and utter torment, substantial embarrassment, public humiliation, anxiety, and the desire to refrain from any significant public interaction.  *Id.*

Likewise, the factor pertaining to the size and demographics of the target's community is significant.  Because Owego is a small town, it is difficult to "evade the stigma" caused by the Posts – especially when over 595 Posts have been published on the internet, including on various social media platforms.  *Id.* at ¶ 6.  And, given the "world wide reach" of the False Statements, it

---

[2] 1 Video, 537 Recent Tweets, 10 First Tweets, 39 Facebook Post, and 8 Instagram Posts.

is no surprise that Weitsman and his company have been impacted nationwide and throughout the entire scrap recycling industry. Weitsman, both personally and professionally, has had to defend numerous inquiries over the last two years due to the Posts, including but not limited to inquiries from family, friends, employees, customers, prospective customers, and government officials about whether he was associated with any of False Statements and whether they were true. *Id.* at ¶ 7.

Accordingly, $200,000 is an extremely conservative amount to compensate Weitsman for his loss of reputation and the humiliation and mental suffering caused by the defamation and harassment over a period of almost two years, and Weitsman respectfully requests that the Court award no less than $200,000 in presumed/general damages.

### C.    Special and general damages sought by USS

USS seeks an award against Defendant for actual damages in the amount of $200,000 in addition to general/presumed damages in the amount of $200,000.  In an attempt mitigate the irreparable harm that is being caused by the Posts, USS paid a reputation management/public relations person to assist in addressing the PR nightmare created by Defendant. *Id.* at ¶ 8. It is common knowledge that most customers research the applicable business or product on the internet before engaging in business with the company or purchasing the product.  Typically, this research consists of using a search engine, such as Google, to see what has been published about the company or product.  As a result, in an attempt to ensure that prospective customers researching USS were not deterred from doing business with USS due to the Posts, USS has paid Stephen Donnelly to assist in publishing positive content on the internet about USS. *Id.*   Prior to hiring him for this purpose, the Posts were ranking on the first page of various Google search results related to USS and Weitsman.  It has taken several months to push back to the Posts to page five

14

of the Google search results for "Adam Weitsman Upstate Shredding," and USS has paid Stephen Donnelly no less than $36,000 to achieve these results.   *Id.* at ¶ 8. Additionally, Weitsman estimates that approximately no less than $180,000 to $200,000 in scrap sales have been lost because of the False Statements. *Id.*

"[A] person who is defamed has a duty to minimize the effects of the defamation[, and] [o]ne who attempts to mitigate such damages is entitled to recover reasonable expenses that are proportionate to the injury and to the consequences to be averted." *Wachs v. Winter*, 569 F. Supp. 1438, 1446 (E.D.N.Y. 1983). Accordingly, given the harm that has likely been avoided, USS respectfully requests that the Court award no less than $200,000 in actual/special damages.

Additionally, for many of the same reasons discussed above, general/presumed damages in the amount of 200,000 is an extremely conservative amount to compensate USS for its loss of reputation caused by the defamation over a period of almost two years. *See Cantu v. Flanigan*, 705 F. Supp. 2d 220, 231 (E.D.N.Y. 2010) (affirming a jury award of $150M in non-economic damages). Again, after receiving a cease and desist letter from counsel specifically explained to the Defendant why the publications were false, defamatory and highly damaging to the Plaintiffs, the Defendant's publication of the False Statement significantly increased, and the Defendant published hundreds of Post on the internet, which accuse USS of being used to help Cal Harris get away with murder (one of the most serious crimes) and laundering drug money for Joaquín "El Chapo" Guzmán. And because Owego is a small town, it is difficult to "evade the stigma" caused by the Posts – especially when over 595 Posts have been published on the internet, including on various social media platforms.   USS has grown to be a successful company because of its reputation for reliability. *Id*. at ¶ 9. However, customers are certainly likely to question how long a company will be around when the company is being accused of assisting in the murder of an

innocent woman, as well as laundering drug money for one of the biggest drug lords in existence, "El Chapo". *Id*. Accordingly, USS respectfully requests that the Court award no less than $200,000 in presumed/general damages.

### D.   <u>Punitive damages sought by Plaintiffs</u>

In New York, "[a]ctual malice, as defined by *New York Times Co. v. Sullivan,* is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information." *Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 184 (2d Cir.2000) (quoting *Prozeralik v. Capital Cities Communications,* 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34, 42 (N.Y.1993)). Rather, plaintiff must establish common law malice, showing "by a preponderance of the evidence that the libelous statements were made out of 'hatred, ill will, [or] spite.' " *Id.* In such cases, punitive damages "punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard of another's rights." *Id.*   Although "punitive damages should bear some reasonable relationship to the harm done and the flagrancy of the conduct causing it," *I.H.P. Corp. v. 210 Cent. Park South Corp.,* 16 A.D.2d 461, 228 N.Y.S.2d 883, 889 (N.Y.App.Div. 1st Dept.1962), an award in a defamation case of nominal compensatory damages and substantial punitive damages is within the court's province under the applicable New York law. *See Goldwater v. Ginzburg,* 414 F.2d 324, 340 (2d Cir.1969); *see also Celle,* 209 F.3d at 191 (awarding $1 in compensatory damages and $10,000 in punitive damages). The purpose in awarding such damages is both to deter the person who made the libelous statement from doing so again and to warn others not to engage in such conduct. *See Wachs v. Winter,* 569 F.Supp. 1438, 1444 (E.D.N.Y.1983).

Here, in this case, when considering the circumstances, it is evident that the Defendant published the False Statements out of spite or ill will.  Defendant was employed by USS as a scrap

metal inspector at its Owego location from approximately November 2011 until approximately December 2014. Very shortly after Defendant was terminated from USS in December of 2014, Defendant began publishing the False Statements on the internet to damage Plaintiffs' professional reputations. Out of spite for Plaintiffs, Defendant recently called labeled himself as the "Scrap King Slayer."  *See* <u>Exhibit D</u> at ¶ 18.  The Defendant was and is still clearly angry about being terminated and wants revenge.

After Defendant received the cease and desist letter from Plaintiffs' counsel – which specifically explained to the Defendant why the publications were false, defamatory and highly damaging to the Plaintiffs – the Defendant's publication of the False Statement significantly increased, and the Defendant published hundreds of Post on the internet.  And after being sued, and receiving notice of the lawsuit, the Defendant continued to publish numerous Posts – even though the Defendant was specifically informed that Plaintiffs were seeking injunctive relief to prevent the irreparable harm that was being continuously caused by his conduct.  On October 5, 2017, Plaintiffs' counsel emailed the Defendant requesting that he agree "to a stipulated injunction, precluding [Defendant] from publishing false information about Plaintiffs." *See* <u>Exhibit D</u> at ¶ 19. However, Defendant failed and refused to stipulate to any injunction or otherwise mitigate the harm that was being caused. Instead, after receiving the email, Defendant published an additional 17[3] Posts.   The Defendant's conduct is extremely reprehensible and should be punished accordingly.   Therefore, each Plaintiff respectfully requests punitive damages in the amount of $250,000 (for a combined total of $500,000 in punitive damages).

### E.      Permanent injunctive relief sought by Plaintiffs

---

[3] 6 Facebook Posts, 3 Instagram Posts, and 8 Recent Tweets.

As pled in their complaint, Plaintiffs seek to enjoin the Defendant from further publishing the False Statements, as well as compel Defendant to remove the False Statements. *See* Complaint, ¶¶ 73-78 (Doc. 1). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Cendant Corp. v. Forbes*, 70 F. Supp. 2d 339, 345 (S.D.N.Y. 1999). "[A] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Granite Music Corp. v. Center Street Smoke House, Inc.,* 786 F.Supp.2d 716, 729 (W.D.N.Y.2011) (quoting *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)).

"While the granting of a mandatory injunction compelling a party to affirmatively act (i.e. directing removal of statements from the web sites) has been labeled an extraordinary and drastic remedy (*Times Square Stores Corp. v. Bernice Realty Co.,* 107 A.D.2d 677, 682, 484 N.Y.S.2d 591), 'in special cases where it is justified, [it] may be issued' particularly 'where the invasion of the plaintiff's rights is deliberate and intentional, as well as where the defendant is engaging in unlawful conduct which is capable of repetition' " *Rombom v. Weberman*, No. 1378/00, 2002 WL 1461890, at *12–13 (N.Y. Sup. Ct. June 13, 2002) (*citing* 67A N.Y. Jur 2d, Mandatory Injunctions, § 44), *aff'd,* 309 A.D.2d 844, 766 N.Y.S.2d 88 (2003). In this regard, "an injunction will lie to restrain libel when the publication is made as part and parcel of a course of conduct deliberately carried on to further a fraudulent or unlawful purpose." *Trojan Elec. & Mach. Co., Inc. v.*

18

*Heusinger,* 162 A.D.2d 859, 860, 557 N.Y.S.2d 756; *see also Ansonia Assocs. Ltd. Pshp. v. Ansonia Tenants' Coalition, Inc.,* 253 A.D.2d 706, 707, 677 N.Y.S.2d 575.

### i.   <u>Irreparable injury and inadequate remedies at law</u>

Irreparable harm is generally caused when reputation or goodwill is negatively impacted. *See Amini Innovation Corp. v. KTY Int'l Mktg.,* 768 F. Supp. 2d 1049, 1057 (C.D. Cal. 2011) (holding that the company's "damages would be difficult to value due to the unknown impact on [its] goodwill"). Additionally, "[a]s a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violations." *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 520 (9th Cir.1993). And here, the Defendant's default constitutes an admission of liability. *See CommScope, Inc. of N. Carolina v. Commscope (U.S.A.) Int'l Grp. Co.,* 809 F. Supp. 2d 33, 41–42 (N.D.N.Y. 2011). Moreover, "the continued presence of the defamatory statements on defendants' web sites will not only render much of the judgment academic, but will further injure plaintiff's personal and professional reputation and cause plaintiffs to lose potential clients, for which there will be no adequate remedy at law." *Rombom*, No. 1378/00, 2002 WL 1461890, at *12–13 (citing *Bingham v. Struve*, 184 A.D.2d 85, 90, 591 N.Y.S.2d 156).

Here, in this case, unless the requested injunctive is granted, the Plaintiffs will continue to suffer harm further irreparable harm that monetary damages cannot remedy. Money damages will not prevent (1) USS, Weitsman, and his family from being further harassed and tormented as a result of the False Statements remaining online and/or (2) the Defendant's continued publication of the same. Additionally, no relief is available for the countless lost business opportunities and clients that will result but may not ever be made known to the Plaintiffs. How often do prospective clients or business contacts disclose to a plaintiff, whom they never spoken with, that they decided

to take their business elsewhere because of what they read online?  As matter of common sense, the answer is "not many."  Under the circumstances, the Plaintiffs have clearly demonstrated irreparable harm and that no adequate remedies at law exist.

### ii.     The balance of hardships and the public interest

The Defendant faces no hardship from being enjoined from continuing the unlawful conduct at issue and/or being required to remove the False Statements; however, as discussed, Plaintiffs would continue to suffer significant irreparable harm. Moreover, the scope of the proposed injunction is narrowly tailored to only require removal of the False Statements, as well as the continued publication of the same. Therefore, the balance of equities tips in favor of granting the injunctive relief sought.

Similarly, the public interest also weighs in favor of granting the proposed injunction. Cyber bullying, harassment and defamation has become a serious problem – especially for the younger generations. *See* https://www.ag.state.mn.us/consumer/Publications/BullyingAndHarassment.asp (lasted visited 11/1/17). And it is critical that the courts of law in our society do not enable the wide-spread abuse of the First Amendment that is plaguing our nation.  Enabling such abuse sends the wrong message to the younger generations and retards our growth as a society. *See* https://nobullying.com/six-unforgettable-cyber-bullying-cases/ (last visited 11/1/17).  Clearly our founders never envisioned something as powerful as the internet, much less the lifelong harm that could be caused by its abuse. *See Hartman v. Morning Journal Ass'n*, 19 N.Y.S. 398, 399–400 (Com. Pl. 1892) ("The greater the circulation of the paper, the greater the probable injury.").

Accordingly, the Court should grant the requested injunctive relief.

### F.     Entering the requested form of judgment against the Defendant is appropriate

"In considering a motion for default judgment, the Court is guided by the same three factors that apply to a motion to set aside entry of a default judgment." *Buttnugget Publ'g v. Radio Lake Placid, Inc.,* 807 F. Supp. 2d 100, 106 (N.D.N.Y. 2011) (citations omitted). Specifically, the court considers "(1) 'whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment.' " *Id.* (quotation and other citations omitted).

As discussed in counsel's letter to the Court requesting permission for alternative service (Doc. 9), the Defendant has acknowledged publicly, on Facebook.com, that he has received a copy of the Summons and Complaint, yet the Defendant has still failed to answer or otherwise defend this lawsuit. Additionally, on October 27, 2017, after counsel emailed the Defendant a copy of the Application for Entry of Default, the Defendant called the Court and stated that he would be sending in a request for an extension. *See* Docket Text Entry entered on 10/27/2017 at 5:22 PM EDT. However, to date, no extension, answer or other responsive pleading has been filed with the Court. Accordingly, the Defendant's default was indeed willful.

Additionally, as discussed above, given that the False Statements are clearly false and defamatory, the Defendant is not capable asserting any meritorious defense, and the level of prejudice the Plaintiffs would suffer as a result of a denial of this Motion would cause substantial and permanent irreparable harm. Therefore, entering the requested form of judgment against the Defendant is appropriate, reasonable and necessary.

## IV.    <u>CONCLUSION</u>

Therefore, based upon the foregoing, Plaintiffs respectfully request that the Court enter the proposed Default Judgment, attached to <u>Exhibit "A"</u> hereto, against the Defendant, and/or in the

alternative, for a hearing in the entry of judgment against the Defendant, and for such other and

further relief as the Court finds reasonable and necessary.


Respectfully submitted,


DATED: December 6, 2017.

/s/ Raeesabbas Mohamed
Raees Mohamed (AZ Bar #027418)
(admitted *Pro Hac Vice*)
Bar Roll No.: 303283
Daniel R. Warner (AZ Bar #026503)
(admitted *Pro Hac Vice*)
Bar Roll No.: 303292

KELLY/WARNER, PLLC
8283 N. Hayden Road, Suite 229
Scottsdale, AZ 85258
(480) 331-9397
(866) 961-4984 (Fax)
raees@kellywarnerlaw.com

**ATTORNEYS FOR PLAINTIFFS**